## LYONS HOLLIS ASSOCIATES, INC.

v.

## NEW TECHNOLOGY PARTNERS, INC.

### No. 3:03CV270(JBA).

United States District Court,
D. Connecticut.

May 12, 2002.

James G. Green, Jr., Brian L. Wolinetz, Pepe & Hazard, Hartford, for Lyons Hollis Assoc Inc, plaintiff.

Thomas J. Finn, Paula Cruz Cedillo, Halloran & Sage, Hartford, Arnold Rosenblatt, Cook Little Rosenblatt & Manson, Manchester, NH, for New Tech Partners Inc, defendant.

*RULING ON PLAINTIFF'S APPLICATION FOR ORDER PENDENTE LITE AND MOTION FOR DISCLOSURE OF ASSETS*

MARGOLIS, United States Magistrate Judge.

On January 17, 2003, plaintiff, Lyons Hollis Associates, Inc. ["Lyons Hollis" or "plaintiff"] filed an Application for Order Pendente Lite, along with an affidavit of John G. Lyons in support, a Proposed Order and Order to Show Cause, and a Motion for Disclosure of Assets in the Superior Court of Connecticut, Judicial District of Hartford. On February 12, 2003, defendant, New Technology Partners, Inc. ["NTP" or "defendant"], removed the pending action to this Court

(Dkt.# 1),[1] filed a Notice of Pending Motions (Dkt.# 4),[2] and filed its Compliance with Standing Order in Removed Cases. (Dkt.# 5).[3] The next day, NTP filed a Supplement to Notice of Removal. (Dkt.# 6).[4] On March 5, 2003, NTP filed its brief in opposition to Lyons Hollis' motions. (Dkt.# 9).[5] Later that day, the pending motions were referred to this Magistrate Judge by United States District Judge Janet Bond Arterton. (Dkt.# 10).

A telephone conference was held eight days later (Dkt.# 14) and on April 3, 2003, Lyons Hollis filed its brief in support of its Application for Order Pendente Lite and Motion for Disclosure of Assets (Dkt.# 16).[6] An evidentiary hearing was held before this Magistrate Judge on April 10, 2003 at which John ("Jack") Lyons ["Lyons"] and Robert ("Brooke") Hollis ["Hollis"] testified for Lyons Hollis, and Bruce Backa ["Backa"] and David Crocker ["Crocker"] testified for NTP. (Dkts. 18–20).

For the reasons set forth below, plaintiff's Application for Order Pendente Lite and plaintiff's Motion for Disclosure of Assets are *granted.*

## I. FACTUAL FINDINGS

As Lyons testified, Lyons Hollis is a Connecticut corporation that, *inter alia,* provides business intermediary and finders' services to facilitate the location of potential purchasers for sellers of businesses and/or business assets. Backa testified that NTP is an operating company in the business of selling and licensing software to end-user clients, and NTP Software, Inc. ["NTP Software"] is the holding company that owns the underlying software and technology.

On or about June 2, 2001, Lyons Hollis and NTP entered into a Consultant Services Agreement ["Agreement"] "in con-

1. Attached to defendant's Notice of Removal are the following three exhibits: copy of Writ and Summons, dated January 17, 2003 (Exh. A); copy of plaintiff's Application for Order Pendente Lite, dated January 17, 2003, copy of affidavit of John G. Lyons, dated January 17, 2003, copy of Consulting Services Agreement, dated June 2, 2001, copy of plaintiff's demand for arbitration, dated January 17, 2003, another copy of Consulting Services Agreement, dated June 2, 2001, copy of correspondence, dated November 20, 2001, copy of Veritas Non–Disclosure Agreement, dated November 8, 2001, copy of correspondence, dated August 2, 2002, copy of e-mail correspondence, dated November 7, 2002, copy of plaintiff's Proposed Order Pendente Lite, dated January 17, 2003, and copy of plaintiff's Order to Show Cause, dated January 17, 2003 (Exh. B); and copy of plaintiff's Motion for Disclosure of Assets, dated January 17, 2003 (Exh. C).

2. Exhibits B and C of Dkt. # 1 are attached to defendant's Notice of Pending Motions (Dkt.# 4) as Exhs. A and B.

3. Attached are the following three exhibits: copy of defendant's Notice of Pending Motions, dated February 12, 2003 (Exh. 1, *see also* Dkt. # 4); duplicate copies of Dkt. # 1, Exh. B (Exh. A); and duplicate copies of Dkt. # 1, Exh. C (Exh. B).

4. Five exhibits are attached: copy of defendant's Notice of Filing Notice of Removal filed with the Superior Court in Hartford, dated February 12, 2003 (Exh. A); copy of defendant's Notice of Removal filed with this Court, dated February 12, 2003 (Exh. 1; *see also* Dkt. # 1); copy of Writ and Summons, dated January 17, 2003 (Exh. 1.A); and duplicate copies of exhibits B and C of Dkt. # 1 are attached as Exh. 1.B and Exh. 1.C.

5. Attached to defendant's brief are two exhibits: affidavit of Bruce Schwartz, dated March 3, 2003 (Exh. A) and affidavit of David Crocker, dated March 3, 2003 (Exh. B).

6. Attached are copies of case law (Exh. A). Lyons Hollis filed an Errata and Supplemental Memorandum in Clarification (Dkt.# 17) six days later.

nection with the sale of its business." (Exh. 3, at 1).[7] Pursuant to the Agreement, NTP agreed to pay a "Success Fee ... in cash at the time of closing" of any transaction between NTP and a "Buyer referred by" Lyons Hollis; the fee would be based on "the aggregate consideration received by [defendant] in connection with the transfer of the Business." (Exh. 3, at ¶ 2). Moreover, the Agreement provides that

> [t]he terms of this Agreement are applicable to any sale of the Business, regardless of whether [defendant] and the purchaser decide to structure such sale as an asset or stock transaction, assumption of liabilities, merger, joint venture, partnership, license or other business arrangement.

(Exh. 3, at ¶ 1). Thus, the sale of the entire business, the crux of which, according to NTP, is the selling and licensing of software, could be structured in various different ways. Additionally, pursuant to the Agreement, Lyons Hollis' "Success Fee [would] accrue in connection with any sale of the Business occurring during the term of this Agreement ..., regardless of whether the purchaser in such transaction has been referred to [NTP] by [Lyons Hollis]." (Exh. 3, at ¶ 4). The Agreement also included a two-year "tail" provision, such that a Success Fee would be paid for any sale covered by its scope, as long as that sale occurred within two years of its termination. (*Id.*).

Shortly after Lyons Hollis and NTP entered into the Agreement, Lyons Hollis developed a twenty-five page confidential corporate profile of NTP which it ultimately sent to approximately twenty companies. (Exhs. 5 & 17). According to Lyons' testimony, Lyons Hollis, led by Dan Mayo ["Mayo"],[8] a Lyons Hollis associate, spent more than 1300 hours courting potential buyers and developing this profile. (*See also* Exh. 17).[9] The purpose of the profile was to "present [NTP] to prospective buyers for purposes of acquisition." (Exh. 5, at 4). Included in the profile was the following statement: **"Please note that it is requested that no one at [NTP] be contacted regarding this acquisition. Please direct all inquires to Jack Lyons, Brooke Hollis, or Dan Mayo at the telephone numbers indicated on the first page of this profile."** (*Id.*)(emphasis in original). The profile focuses on the storage systems available from NTP Software.[10] (Exh. 5).

7. Lyons Hollis and NTP previously had entered into a Consulting Services Agreement in 1997 to sell the NTP's business, which, at that time, consisted of NTP, NTP Software and NTP Consulting. (Exh. 1). Lyons Hollis placed NTP in contact with a buyer which resulted in the sale of NTP Consulting shortly thereafter. (Exh. 2). NTP and NTP Software remained after the first sale; NTP continued as the operating shell and it retained the business rights to sell software and collect revenue on NTP Software's behalf. Plaintiff was paid its Success Fee by NTP after the 1997 sale.

8. Lyons testified that from June 2001 to September 2002, Mayo devoted all of his working hours to NTP as Lyons Hollis' client. In addition to Mayo, Lyons, his partner Hollis, and Purcell, another Lyons Hollis associate, worked on drafting the profile and attended meetings with potential buyers. Hollis categorized his role as "supportive" to that of Lyons and Mayo.

Lyons Hollis was aware that regardless of the number of hours invested, the payment of a Success Fee was contingent on a fulfillment of the terms of the Agreement.

9. The NTP Software Status Report, kept by Mayo, shows that ninety-seven companies were contacted on NTP's behalf. Of those ninety-seven companies, approximately thirteen companies expressed an interest in storage technology and eighteen were sent NTP's profile. (Exh. 17).

10. Throughout the profile, NTP Software touts its storage capability as its main selling point:

> NTP Software is a privately held successful and established technology company fo-

Along with the profile, Lyons Hollis would send a Non–Disclosure Agreement to be signed by the prospective buyer, in order to protect the confidential nature of the profile. (*See, e.g.*, Exh. 4). Lyons testified that on November 8, 2001, in connection with the introduction to NTP, Veritas signed one such agreement, "protect[ing] certain confidential information which may be disclosed between [Veritas] and [Lyons Hollis] ... on behalf of its client [NTP]" "[f]or the potential merger, investmenting [sic], recapitalization or acquisition of Lyons Hollis' client [NTP] by Veritas." (Exh. 4).

As Lyons testified, the companies Lyons Hollis targeted were not picked arbitrarily; NTP may have been familiar with the companies and may have even done business with them prior to Lyons Hollis' involvement as an intermediary between NTP and the companies for the purpose of the sale of NTP. In fact, Backa, a significant shareholder of NTP and NTP Software, testified that, in this case, NTP was familiar with Veritas' business since Veritas is one of a limited number of companies in the storage management business and NTP had a previous relationship with Veritas—Veritas purchased a "small license" of some of NTP's technology, and they had engaged in conversations with respect to future dealings.

Soon after Lyons Hollis referred Veritas to NTP for the purpose of purchasing NTP's business, Veritas began direct and extensive negotiations with Crocker, President of NTP Software.[11] Approximately six months later, Veritas sent Lyons Hollis its first offer proposing payment of $12,000,000 to $13,000,000, subject to due diligence, in exchange for all of the tangible and intangible assets of NTP. (Exh. 8). Around this time, a second company, Net IQ, had also expressed its interest in the purchase of NTP after receiving a copy of the profile and Non–Disclosure Agreement. In an e-mail dated May 24, 2002, Backa informed Mayo and Crocker that assuming Net IQ would offer $10,000,000 for the products only, not for the entire company, then an offer from Veritas of $15,000,000 for the same deal "is a great deal." (Exh. 6). However, according to Backa, Veritas' offer of $12,000,000 for the entire company is a "non starter." (*Id.*). Backa concluded that if $12,000,000 is Veritas' final offer, then Backa would say no and accept Net IQ's offer to buy the products only. (*Id.*). Thus, by May 2002, as a result of the pending offers, NTP was considering selling a part of its business rather than the entire business.

Veritas thereafter submitted a second offer to "acquire all of the assets (tangible and intangible) of NTP *in an asset purchase transaction*" for consideration of $13,000,000. (Exh. 9, at 1)(emphasis in original). In response, Lyons sent an e-mail to NTP, its counsel, Marc Elfman ["Elfman"], and Mayo on June 20, 2002,

cused on solving storage resource management issues....

NTP's Software's key strengths are its superior technology, the quality of its software products, and its experience in the storage resource management market.... NTP Software has evolved... to focusing on solving enterprise storage management problems.

(Exh. 5, at 5). According to the profile, "NTP Software['s] ... latest product offerings ... [include] NTP Software Quota and File Senti-

nel and NTP Software StorageReporter." (Exh. 5, at 13). A sale of NTP Software would include: (1) EASE Technology; (2) NTP Software Quota & File Sentinel; (3) NTP Software StorageReporter; and (4) the less emphasized SOFA HSM archiving product. (Exh. 5, at 13–19).

11. Lyons testified that he did not deal with any banks in relation to this transaction; Crocker was in charge of all negotiations after the initial introduction to Veritas and Net IQ.

offering comments relating to the proposed structure of the purchase and the terms of the agreement. (Exh. 7). Included in these comments was a suggestion that the sale be structured as a stock purchase rather than as an asset purchase and that Veritas be informed that NTP Software is the holder of the technology and is not the operating company. (Exh. 7). The difference, for tax purposes, between a stock and asset sale is significant; the total taxes to be paid by NTP in an asset sale would nearly double the amount owed if the sale was a stock purchase. (Exh. 11). Lyons' comments, however, reflected information that NTP likely already knew. Bruce Schwartz, NTP's Chief Financial Officer, constructed a comparison sheet based on the assumption that Veritas would purchase assets from NTP and NTP Software would sell selected assets to NTP prior to the sale to Veritas. (*Id.*). The comparison sheet reveals that NTP would net approximately $100,000 more from a stock sale.

According to Schwartz's comparison sheet, the selling price of NTP assets would exceed $14,500,000 while the selected assets of NTP Software, including its products Quota File Sentinel ["QFS"] [12] and Quota Manager,[13] later succeeded by StorageReporter,[14] were valued at $500,000. NTP would pay NTP Software $500,000 consideration in such a sale because the technology that supports NTP exists in NTP Software; thus, NTP Software holds the key to the future financial growth of the company. NTP's estimate of $500,000 for specific assets of NTP Soft-

ware, however, is not in accord with the historical sales documents upon which plaintiff relies, nor is this estimate or plaintiff's valuation consistent with the value NTP later assigned to the StorageReporter software. According to plaintiff's exhibits, historical sales documents tracing sales of NTP's products from 1999 through the fourth quarter of 2001 evidence a progressive and substantial decline in sales of the majority of NTP's products, offered through NTP Software, with a notable exception in the sales of the QFS software. (Exh. 13). Furthermore, while the sale of Quota Manager software steadily declined from 1999–2001, securing only 10% of NTP's sales by the end of 2002, the sale of the StorageReporter software, which was the successor product to Quota Manager and which, according to plaintiff, was first introduced in the second quarter of 2002, grew exponentially from $42,500 in the second quarter to $375,000 in the third quarter to $770,000 in the fourth quarter, thus making this product only second in sales to the QFS technology. (Exh. 14). By 2003, StorageReporter was NTP's largest product, with sales exceeding $1,000,000. (Exh. 14).

Backa claims that this sales history was not prepared by NTP. To the contrary, NTP's sales figures show that StorageReporter sales from 2000–2002 barely exceed $44,000, all of which occurred in 2001—one year prior to the launch of StorageReporter, according the plaintiff, and one year prior to the complete sale of the StorageReporter software to Veritas, according to defendant. (Exh. A). NTP derived the

---

**12.** NTP Software's QFS protects data and manages storage resources by, among other things, monitoring disk operations in real-time, setting storage quotas, prohibiting disks from being used to store certain types of files, and defining a maximum size for directories. (Exh. 5, at 15–16).

**13.** Quota Manager software controls the amount of space that a user can put on shared storage.

**14.** StorageReporter is a collection of software objects which create a system to report the use of storage in an environment.

$44,000 number from a transaction involving a single purchase of a license of the StorageReporter software. While NTP's StorageReporter sales figures are significantly less than those of Lyons Hollis, NTP's QFS sales figures doubled from 2000 to 2001 (from $71,553.46 to $1,452,927.67) and tripled by 2002 (reaching $2,254,082.42). (Exh. A). NTP claims that the StorageReporter software was valued low because although the value of the software had steadily increased in its hands, NTP claims not to have seen a growth in the marketplace. However, as discussed further below, despite defendant's claims, by 2002 the value of StorageReporter software in the marketplace was $4,500,000.

Veritas' final offer included a purchase price of $15,000,000 for all tangible and intangible assets of NTP, inclusive of the assets which NTP Software would sell to NTP, in an asset purchase transaction, subject to the performance of due diligence.[15] (Exh. 10). At the time NTP received this final offer, NTP and Lyons Hollis were excited about the prospect of an impending sale of the entire entity. However, after Veritas' due diligence team completed its assessment, in the words of Veritas, the "deal [was] dead." (Exh. 12). Crocker, who was primarily responsible for the due diligence team,[16] kept notes during the due diligence process which indicate that NTP's "[e]ngineering [was] the issue" for Veritas, not price; NTP had an insufficient number of engineers dedicated to the StorageReporter, NTP had "failed the engineering test," and the "[t]echnical review was not positive at all." (Id.). Moreover, Veritas had "[n]o interest in [purchasing] QFS." (Id.). Crocker could not recall if Veritas completed its investigation; however, whether the investigation was complete or not, Veritas' assessment of NTP destroyed the potential of a sale of the entire company since, at that time, Quota Manager and the QFS software comprised approximately 86% of NTP's sales. Quota Manager, and later StorageReporter, the product which Veritas found lacking engineering support, was and is interrelated with QFS, the product which Veritas had no interest in purchasing. Although one of Veritas' people remained in support of the sale,[17] Veritas consequently withdrew its offer.

Shortly thereafter, Backa decided that NTP "seemed as good at working to sell the company as anyone else," so on August 2, 2002, NTP terminated its 2001 Consulting Services Agreement with Lyons Hollis, to be "effective thirty (30) days from the date of this notice." (*See* Exh. 15). Crocker claims that he too was not satisfied with Lyons Hollis' work because they "didn't do anything" related to the sale. The Agreement specifically provides, however, that "the scope of services rendered by [Lyons Hollis] under this Agreement does not involve any attempt on [Lyons Hollis'] part to *negotiate* a purchase and sale agreement for any transaction." (Exh. 3, at ¶ 1)(emphasis added). Rather,

---

15. Throughout the progression of the three offers, Crocker consulted Lyons about the pricing but Lyons Hollis did not offer substantive feedback short of the comments made in June 2002. Crocker and NTP's legal team, without assistance from Lyons Hollis, negotiated the terms and conditions of the prospective sale.

Net IQ, the only other company to submit a letter of intent, also performed due diligence.

16. Although Crocker was in charge of the team of about "a half dozen" people from Veritas, he could not recall if Veritas completed its investigation.

17. Crocker's notes indicate that Suresh will "champion [the deal because he] does not want this to go away. He will have to resurrect this if this is going to get done. He needs the support of Michael TP. He was not there." (Exh. 12).

pursuant to the Agreement, Lyons Hollis was "to identify, and ... bring to [NTP's] attention, potential purchasers for the business and, *as reasonably requested*, ... assist [NTP] in connection with the consummation of any such sale." (*Id.*)(emphasis added). There are no e-mails or letters from NTP to Lyons Hollis indicating dissatisfaction with Lyons Hollis' performance, or requesting assistance relating to the terms of the sale. Moreover, as discussed above, Lyons sent an e-mail offering his comments and suggestions relating to the structure of the prospective sale.

Crocker testified that shortly after Veritas informed NTP that it was not interested, NTP considered selling the StorageReporter software as a stand-alone product. Crocker was aware that certain people at Veritas, including Suresh, were still interested in purchasing a part or the whole of NTP's business. Crocker's testimony relating to the details of this next phase of negotiations and the ultimate purchase of the StorageReporter software, however, was inconsistent. After testifying that in mid-September, *he* called Suresh and arranged to meet with him to discuss what had happened in July when the sale fell apart, Crocker testified that it was *Suresh* who contacted him in September after Crocker created a new product, SRM software, to get Veritas' attention. Crocker then admitted that Veritas never expressed any interest in NTP's SRM software; rather Veritas allegedly sought Crocker out to resume discussions relating to the purchase of the StorageReporter software and the associated intellectual property.

Once the parties reinitiated contact, Crocker negotiated the terms of the sale of the StorageReporter software with Veritas which included NTP's retention of the QFS software which requires an integrated relationship with the StorageReporter.

Although Crocker could not recall when he received a letter of intent from Veritas, he believes that the sales agreement was reached on or about November 7, 2002. StorageReporter was sold for $4,500,000, a value Crocker claims was insignificant to NTP compared to the value of the StorageReporter to Veritas. At that time, the StorageReporter software comprised a significant share of NTP's assets, the total of which just barely exceeded $14,500,000.

Lyons learned that NTP sold the StorageReporter software to Veritas from Veritas' press release, dated November 13, 2002; no one at NTP contacted him personally. (Exh. 16). The press release verifies that Veritas "purchased only the StorageReporter product from NTP Software. NTP Software retained ownership of its [QFS] software... [which] is closely integrated with the StorageReporter product and [Veritas] intends to maintain this relationship going forward." (*Id.*). Thereafter, Lyons Hollis contacted Elfman to inquire whether it was NTP's choice to retain the QFS product, in which case, Lyons Hollis would expect to be paid. Moreover, because the sale of the StorageReporter product occurred within the two-year tail provision of the Agreement, Lyons Hollis expected NTP to pay its Success Fee. Without receiving substantive feedback from Elfman, Lyons met with Crocker to discuss the sale and his claim to the Success Fee. Crocker informed him that the StorageReporter was sold for $4,500,000; thus, pursuant to the terms of the Agreement, Lyons demanded payment of $250,000. (*See* Exh. 3, at ¶ 2). In response, Crocker told him that NTP did not owe Lyons Hollis anything and Crocker conveyed NTP's inability to pay Lyons Hollis at that time.

On or about January 17, 2003, Lyons Hollis initiated arbitration proceedings with the American Arbitration Association,

in accordance with the terms of the Agreement [18] and initiated an ancillary suit in the Superior Court of Connecticut, Judicial District of Hartford, which defendant removed to this Court.

Lyons Hollis contracted with NTP to be paid on a contingent fee basis rather than on an hourly basis. Backa testified that he would not have entered into an agreement including an hourly rate because under such an agreement, he could not commit the party to a higher level of effort and he could not guarantee success. The contingent fee was to be calculated according to the terms of the Agreement which provides

> If [NTP] consummates a transaction with a Buyer referred by [Lyons Hollis], [Lyons Hollis] shall receive a fee (the "Success Fee") payable in cash at the time of the closing of the transaction... and determined as follows on the basis of the aggregate consideration received by [NTP] in connection with the transfer of the Business:
>
> 6% of the first $2,000,000 or portion thereof, plus
>
> 5% of the second $2,000,000 or portion thereof, plus
>
> 4% of the third $2,000,000 or portion thereof. . . .

(Exh. 3, ¶ 2). In support of plaintiff's claim for *quantum meruit*, Lyons testified that in the absence of a contingent fee

agreement, he and his partner, Hollis, would each charge approximately $350 per hour, in light of their approximately nineteen years experience in their profession. Moreover, Mayo and Purcell, as associates, would charge between $175–225 an hour, commensurate with their experience in the sales and marketing field. [19] Furthermore, at the time of the hearing, attorney's fees exceeded $15,000 and plaintiff's counsel anticipates that the cost of representation for the arbitration proceedings will exceed $50,000.

In plaintiff's Application for Order Pendente Lite, plaintiff seeks (1) to attach sufficient property of defendant to secure the sum of $250,000, exclusive of attorney's fee; (2) to compel defendant to transfer sufficient assets into the State of Connecticut to satisfy the attachment entered by the court in plaintiff's favor; (3) to restrain defendant from transferring assets or property out of the State of Connecticut; and (4) to attach and/or garnish such other assets, accounts, goods, estate, debts or other such property of defendant in the form to be as determined after hearing on plaintiff's Motion for Disclosure of Assets to the value of $250,000, exclusive of attorney's fees. (Dkt.# 1, Exh. B). In opposition, defendant argues that: (1) defendant's assets cannot be attached because defendant does not have any assets located in Connecticut and there is no law grant-

---

**18.** Paragraph 12 of the Agreement provides:

> Any controversy or claim arising out of, relating to, or concerning, in any way, this Agreement, or any breach thereof, including all issues of arbitrability, shall be settled by arbitration in accordance with the commercial arbitration rules of the American Arbitration Association at its Hartford, Connecticut office.
>
> (Exh. 3).

**19.** In addition to the terms of the contingent fee agreement detailed in the Agreement, the

Agreement provides that in the case of NTP's default,

> interest on the unpaid portion shall accrue at the rate equal to the highest rate authorized to be stipulated... under the laws of the State of [NTP's] residence at the time of execution of this Agreement, or twelve percent (12%) per annum if no such highest rate exists in [NTP's] State.

(Exh. 3, at ¶ 7). Pursuant to Connecticut law, interest on the unpaid portion shall accrue at a rate of 10% annually. CONN. GEN. STAT. § 37–3a (2003). *See* note 20 *infra*.

ing Connecticut courts the power to exercise control over property located in another jurisdiction; and (2) even if defendant's assets could be attached, plaintiff is not entitled to a prejudgment remedy under Connecticut law because plaintiff cannot demonstrate that there exists probable cause that it will obtain a judgment greater or equal to $250,000 since plaintiff's failure to sell or transfer a business (rather than a portion of assets), as required under the express terms of the contract, undermines its claim. (Dkt. # 9, at 3–6).

Contrary to defendant's position, plaintiff contends that: (1) Connecticut law allows this Court, by virtue of its personal jurisdiction over defendant, to reach beyond the State of Connecticut in order to attach, garnish or compel defendant to transfer its assets (Dkt. # 16, at 5–8); (2) plaintiff will be able to satisfy the lower standard of probable cause (*id.* at 8–14); and (3) due to the flexible and equitable nature of arbitration, the arbitrator will likely fashion an equitable remedy, reflective of what was contemplated by the parties. (Dkt. # 16, at 14–15).

## II. DISCUSSION

■ Plaintiff has applied for an order pendente lite under CONN. GEN. STAT. § 52–422 which allows for a prejudgment remedy proceeding "as may be necessary to protect the rights of the parties pending the rendering of [an arbitration] award and to secure the satisfaction thereof when rendered and confirmed." *See generally Insurity, Inc. v. Mutual Group, Ltd.*, 2003 WL 21006325 (D.Conn. Jan.13, 2003)(thorough analysis of § 52–422). As United States District Judge Alvin W. Thompson summarized, pursuant to the Connecticut Prejudgment Remedy statute, CONN. GEN. STAT. § 52–278d(a):

the standard for issuing a prejudgment remedy is "whether or not there is prob-

able cause to sustain the validity of the plaintiff's claim." ... "The legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." "Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false."

*Qualitative Reasoning Sys., Inc. v. Computer Sciences Corp.*, 2000 WL 852127, at *9 (D.Conn. Mar. 31, 2000)(multiple citations omitted). At a PJR hearing, a plaintiff is "bound to furnish proof of his damage with reasonable probability, and not leave the trial court to speculation and conjecture." *Mullai v. Mullai*, 1 Conn. App. 93, 95, 468 A.2d 1240, 1242 (App.Ct. 1983) (*per curiam* ). Moreover, after a hearing, the Court must "consider not only the validity of the plaintiff's claim but also the amount that is being sought." *Calfee v. Usman*, 224 Conn. 29, 38, 616 A.2d 250 (1992) (citation omitted). The damages that plaintiff claims "need not be established with precision but only on the basis of evidence yielding a fair and reasonable estimate." *Savalle v. Kobyluck*, 2001 WL 1913746, at *2 (D.Conn. Sept.12, 2001)(citing *Burkert v. Petrol Plus of Naugatuck, Inc.*, 5 Conn.App. 296, 301, 497 A.2d 1027 (1985)).

### A. VALIDITY OF PLAINTIFF'S CLAIM

■ Pursuant to their Agreement, Lyons Hollis was to provide NTP with "potential purchasers for the business." (Exh. 3, at ¶ 1). Lyons Hollis provided NTP with two such potential purchasers, Net IQ and Veritas, both of which submitted letters of intent and performed, at least to some extent, due diligence. Moreover, Lyons Hollis' reliance on the growing sales figures of the specific assets of NTP

Software at issue here is reasonable in light of the ultimate sale price of the StorageReporter software. Therefore, probable cause exists to sustain plaintiff's claim that the ultimate sale of the StorageReporter software constituted a sale of the most important aspect of NTP's business and thus satisfied the terms of the Agreement. Moreover, in light of the lack of credibility the Court assigns to Crocker's testimony, probable cause exists to support a conclusion that after NTP terminated its agreement with Lyons Hollis, NTP approached Veritas, completed the sale of an asset which constitutes a majority of NTP's business, and failed to pay Lyons Hollis in direct violation of the Agreement and its two-year tail provision.

### B. DAMAGES

Plaintiff's estimation of damages are in accord with the terms of the Agreement and a reasonable estimation of attorney's fees. Plaintiff's evidence, therefore, yields a fair and reasonable estimate of damages. *See Savalle*, 2001 WL 1913746, at *2. Plaintiff may attach sufficient property, assets, accounts, goods estate, or debts of defendant to secure the sum of $315,000: $250,000 pursuant to the Agreement; $15,000 for attorney's fees for the hearing; and approximately $50,000 attorney's fees. for the arbitration.[20]

### C. ATTACHMENT OF GOODS OUT OF STATE

■ Defendant erroneously contends that because NTP is a foreign corporation that holds no assets within the State of Connecticut, NTP's assets cannot be attached. (*See* Dkt. 9, at 3–4 & Exh. A). This Court has personal jurisdiction over NTP; thus, "if justice and the reasonable demands of the situation warrant," this Court "may order the defendants to do or refrain from doing, certain acts in another state." *Fleming v. Gray Manufacturing Co.*, 352 F.Supp. 724, 726 (D.Conn.1973)(multiple citations omitted). Moreover, it is within this Court's power to "effectuate a [prejudgment remedy] issued under Connecticut law by ordering the parties over whom the [C]ourt has in personam jurisdiction" to bring such assets into Connecticut for purposes of attachment. *Hamma v. Gradco Sys., Inc.*, 1992 WL 336740, at *2, 1992 U.S. Dist. LEXIS 17601, at *8–9 (D.Conn. Nov. 4, 1992) (citation omitted).

■ This Court conducted an evidentiary hearing, upon due notice to NTP and Lyons Hollis which appeared and were represented by counsel. The evidence presented during the full hearing sustains the Court's decision that it should act in equity to protect Lyons Hollis from the irreparable harm it would suffer should NTP dispose of the assets from which a judgment may be collected.[21] Although this prejudgment remedy may have the effect of an injunction, such order of attachment need not satisfy the requirements of FED. R. CIV. P. 65. *See Ham-*

---

20. As previously indicated, *see* note 19 *supra*, plaintiff sought $25,000 in interest at a rate of 10%, pursuant to CONN. GEN. STAT. § 37–3a from November 2002 through November 2003. The Court declines to award such interest for the simple fact that in its Application for Order Pendente Lite (Dkt.# 1, Exh. B), plaintiff seeks $250,000, exclusive of attorney's fees, without ever mentioning interest.

21. Defendant relies on a medical malpractice case, *Barna v. Schreck*, 2000 WL 1196437, at *1, 2000 Conn.Super. LEXIS 1965, at *4, to support its contention that its property is not subject to attachment. In that case, Judge Radcliffe noted that "plaintiff had pointed to no authority which would validate an attachment of real or personal property located in another jurisdiction." *Id.* As stated above, such authority exists in this District.

*ma,* 1992 WL 336740, at \*2, 1992 U.S. Dist. LEXIS 17601, at \*9–10. Rather, the party seeking this ancillary order need only establish probable cause, as discussed above.

Moreover, § 52–422 explicitly provides that a court "may make ... such order ... as may be necessary to protect the rights of the parties pending the rendering of an [arbitration] award." This language was construed broadly in *Insurity* to find that not only may a court issue an order for disclosure of assets under § 52–422, but "it may do so *prior to,* and *independent of,* a probable cause determination ... because the language of ... § 52–422 vests the court with broad power and discretion...." 2003 WL 21006325, at \*5 (emphasis in original).

### III. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Application for Order Pendente Lite is **granted in the amount of $315,000** and plaintiff's Motion for Disclosure of Assets is also **granted.**[22]

See 28 U.S.C. § 636(b)(**written objections to ruling must be filled within ten days after service of same**); FED. R. CIV. P. 6(a), 6(e) & 72; Rule 2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; *Small v. Secretary, H & HS,* 892 F.2d 15, 16 (2d Cir.1989)(**failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to the Second Circuit**).

---

**22.** Plaintiff's Application for Order Pendente Lite and Motion for Disclosure of Assets are attached as Exhs. B–C to defendant's Notice of Removal. (Dkt.# 1).